UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:13-CV-00073-GNS-HBB

COREY RAY LOGSDON                                                                                PLAINTIFF

V.

TROOPER DANIEL WHITE, and
TROOPER GRAHAM RUTHERFORD                                   DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Daniel White and Graham Rutherford's ("Defendants") Motion for Summary Judgment and Motion to Dismiss.[1] (Defs.' Mot. for Summ. J, DN 40). The motion has been fully briefed and is ripe for a decision. For the reasons stated below, the Court **GRANTS** the motion in part and **DENIES** the motion in part.

### I. SUMMARY OF FACTS AND CLAIMS

The parties agree that on May 30, 2012, Defendants arrested Plaintiff Corey Ray Logsdon ("Logsdon") after chasing him around a field as he drunkenly rode a horse. (Defs.' Mot. for Summ. J. 2-4; Compl. 2-3, DN 1). The parties have differing accounts of the circumstances leading up to and during Logsdon's arrest.

---

[1] Defendants' counsel is reminded to comply with requirements of the local court rules and, in particular, LR 7.1(a), which requires the filing of a separate memorandum in support of non-routine motions. In addition, as the moving party, it was Defendants' duty to cite to evidence in the record in support of their motion. *See Props v. Mammoth Onyz Cave, Inc.*, No. 1:11-CV-00114-M, 2012 WL 4887436, at *2 (W.D. Ky. Oct. 15, 2012) ("The moving party bears the initial burden of specifying the basis for its motion and *identifying that portion of the record that demonstrates the absence of a genuine issue of material fact*." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added))). In Defendants' memorandum, they failed to do so, which would have warranted a denial of the motion. Defendants did cite to the record in their reply.

Defendants allege that Trooper Rutherford ("Rutherford") was dispatched to respond to an emergency call reporting that Logsdon was intoxicated and riding a horse on a public road. (Defs.' Mot. for Summ. J. 2). Because Trooper White ("White") knew that the Logsdon family "disliked police and that certain family members could cause trouble", White also decided to respond. (Defs.' Mot. for Summ. J. 2). Upon their simultaneous arrival, family members confirmed Logsdon was riding a horse intoxicated on public roads, and within short order Logsdon himself arrived on horseback obviously intoxicated, as indicated by his swaying and slurring of speech. (Defs.' Mot. for Summ. J. 3). White told Logsdon to dismount, and Logsdon refused. After his family members asked him to dismount, Logsdon again refused and stated that he was a cowboy and the troopers could not catch him. Logsdon then ran the horse through a gate into an open field. (Defs.' Mot. for Summ. J. 3).

Rutherford followed on foot while White returned to his cruiser and pursued Logsdon into the field. (Defs.' Mot. for Summ. J. 3). White turned his spotlight on Logsdon and demanded through his loudspeaker that Logsdon dismount; meanwhile Rutherford closed some distance and attempted to stop Logsdon with a taser. (Defs.' Mot. for Summ. J. 3). Rutherford's efforts were in vain as White continued to follow slowly behind Logsdon, still speaking into the loudspeaker. (Defs.' Mot. for Summ. J. 3). Logsdon's horse struck a gate, and he dismounted over a fence and continued to flee towards a nearby house. (Defs.' Mot. for Summ. J. 3). White left the cruiser to pursue on foot and he successfully deployed the taser against Logsdon causing Logsdon to fall face-first onto gravel. White then handcuffed Logsdon as a group of Logsdon's family members surrounded White and began angrily yelling at him. (Defs.' Mot. for Summ. J. 3). Paul Logsdon, Jr. (Logsdon Jr.") approached White "in an aggressive manner" and White instructed him to stay back while attempting to restrain Logsdon. (Defs.' Mot. for Summ. J. 4).

2

As Rutherford made his way to the area, Logsdon Jr. continued to aggressively approach White, who was forced to tase Logsdon a second time as he was trying to regain his feet and resist arrest. (Defs.' Mot. for Summ. J. 4). When Rutherford arrived, White informed Logsdon Jr. that he was under arrest and asked Rutherford to restrain him. (Defs.' Mot. for Summ. J. 4). Logsdon, meanwhile, continued to resist, and White tased him a third time, though Logsdon remained unfazed. (Defs.' Mot. for Summ. J. 4). White then punched Logsdon, at which point Logsdon ceased resisting and ultimately began to cooperate. (Defs.' Mot. for Summ. J. 4).

When White took Logsdon to the local jail, the jailer refused to take custody of Logsdon until he was seen at the local hospital and medically cleared. (Defs.' Mot. for Summ. J. 4). White transported Logsdon to the local hospital, but Logsdon refused treatment. (Defs.' Mot. for Summ. J. 4). White and Logsdon then returned to the jail, where White took pictures of Logsdon and the jailer accepted custody of him. (Defs.' Mot. for Summ. J. 4).

Logsdon's account departs significantly from this version of events. He maintains that he rode the horse only "in a field, around the corral, and beside the barn," rather than on a public road. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 2). Logsdon also claims that White rammed the horse "in the rump" with his cruiser multiple times, that he was knocked from his horse rather than dismounted it, that he did not fall on his face after the first taser round, and that he was "hit about the head and face after being struck by the Tazer and handcuffed." (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 3). Logsdon eventually entered an *Alford* plea to several state charges as part of a plea deal. (Defs.' Mot. to Dismiss Ex. 1, DN 50-1).

Logsdon filed this lawsuit alleging that Defendants violated 42 U.S.C. § 1983 by using excessive force, executing an unlawful arrest, detaining and confining Logsdon unlawfully,

3

inflicting cruel and unusual punishment, and refusing or neglecting to prevent harm.[2] (Compl. 8-15). He also asserted various state law claims against Defendants in their official and individual capacities.[3] (Compl. 15-22). In the present motion, Defendants seek dismissal of the remaining individual capacity claims.

## II. JURISDICTION

Logsdon alleges claims arising under 42 U.S.C. § 1983. This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. As to Logsdon's state-law claims, this Court has jurisdiction over those claims as well, as the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "looking to the record as a whole, a reasonable mind could come to only one conclusion . . . ." *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 186 (6th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). "When moving for summary

---

[2] In his response to the motion for summary judgment, Logsdon concedes that his § 1983 claims for unlawful arrest, unlawful detention, and unlawful confinement were extinguished by his *Alford* plea in his criminal case in Hart Circuit Court. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 15). Accordingly, summary judgment will be granted as to both Defendants on those claims.

[3] The Court has previously dismissed the official capacity claims. (Order, DN 13). In addition, Logsdon's response to the motion reflects his abandonment of false imprisonment claim due to his *Alford* plea. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 17). Accordingly, the Court will grant summary judgment in favor of Defendants as to this claim.

4

judgment the movant has the initial burden of showing the absence of a genuine dispute as to a material fact." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists 'a genuine issue for trial.'" *Id.* (citing *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004)).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

### A. Excessive Force and Qualified Immunity

"Qualified . . . immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). It consists of two aspects: one objective and the other subjective. *Id.* "The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' The subjective component refers to 'permissible intentions.'" *Id.* (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)). Qualified immunity will not protect an official who "knew or reasonably should have known" that his action taken within his "sphere of official responsibility" would violate a plaintiff's

5

constitutional rights, or if the official "took the action with the malicious intent to cause a deprivation of constitutional rights or other injury." *Id.* (citation omitted). In short, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 816 (citations omitted).

Because Defendants appear to acknowledge that their acts were discretionary, the only question is whether they violated one or more of Logsdon's clearly established statutory or constitutional rights of which a reasonable person would have known. (Defs.' Mot. for Summ. J. 5). Logsdon alleges three claims under Section 1983: excessive force, cruel and unusual punishment, and refusing or neglecting to prevent harm. (Compl. 8-15).

"[Excessive force] claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (internal quotation marks omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). The Supreme Court noted three non-exclusive factors for courts to consider in analyzing whether the force used to seize a person was excessive: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest by flight." *Id.* (citing *Tennessee v. Gardner*, 471 U.S. 1, 8-9 (1985)).

While not delineated in the Complaint, Logsdon's response to the present motion asserts three instances of unreasonableness by White: (1) White was unreasonable in pursuing Logsdon in the cruiser with its headlights on, blue lights flashing, and spotlight on, as this constituted

6

deadly force; (2) White was unreasonable in ramming the horse with his cruiser, as amounting to deadly force; and (3) White was unreasonable in administering a "beating" to Logsdon after he was tased and handcuffed. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 8, 10).

### 1. *Initiation of the Chase and Show of Force*

There are two obstacles to Logsdon's recovery based upon the allegations of an unreasonable pursuit. First, Logsdon entered an *Alford* plea in state court to the charge of fleeing and evading, 2nd degree. (J., DN 50-1). "The federal courts [] . . . consistently accord[] preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (citation omitted). Under Kentucky law, "[a]n *Alford* plea is a 'plea of guilty,' regardless of any denial of the underlying facts." *Pettiway v. Commonwealth*, 860 S.W.2d 766, 767 (Ky. 1993). That plea is accorded preclusive effect here, meaning that Logsdon did flee and evade Defendants, a crime that is designated a Class A misdemeanor under Kentucky law. KRS 520.100(3). Thus, Defendants had the probable cause necessary to effect a warrantless arrest, which negates any claim of unreasonableness. *See Wong Sun v. United States*, 371 U.S. 471, 478 (1963).

It is significant that White was *attempting* to arrest Logsdon when White drove his cruiser into the field. (White Dep. 34:7-11, Jan. 13, 2015, DN 50-3) ("Q At what point in time did you decide that you were, in fact, going to arrest him? A Well, when he took off running the first time. When he refused to get off his horse and he was DUI, apparently."). "An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). As the Supreme Court has held, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1988) (citing *Hodari D.*,

499 U.S. at 646). *See also Hodari D.*, 499 U.S. at 628 ("[A] seizure could [not] have occurred during the course of the chase because . . . that 'show of authority' did not produce his stop." (quoting *Brower v. Inyo Cnty.*, 489 U.S. 593, 597 (1989)). Thus, because White was not seized by the initiation of the chase or the show of force, White has no Fourth Amendment claim on either for either of those acts.

Accordingly, to the extent that Logsdon alleges a claim of excessive force under § 1983 due to the initiation of his arrest and White's show of force, the Court finds that Defendants are immune to such a claim by reason of qualified immunity.

### 2. *Ramming of the Horse*

One of the two major points of contention between the parties is whether or not White rammed Logsdon's horse with his cruiser during the chase. The Court, however, must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (internal quotation marks omitted). For this reason, the Court will assume that White rammed the horse with his cruiser.

Nevertheless, Logsdon still does not prevail on this claim because he was still eluding arrest when the horse was allegedly rammed. The constitutional protection against excessive force requires first that there be a "seizure." Like the Supreme Court noted in *Hodari D.*, "the term 'seizure' means 'not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control. A ship still fleeing, even though under attack, would not be considered to have been seized as a war prize.'" *Hodari D.*, 499 U.S. at 624. Because the alleged contact with the horse by the police cruiser occurred while Logsdon was still in flight and thus had not been seized, there is no viable excessive force claim.

8

In this case, Logsdon was not seized when the cruiser struck the horse because Logsdon continued to flee. Accordingly, this portion of Logsdon's excessive force claim against White is barred by qualified immunity, and the Court will grant summary judgment to White as to this claim. In addition, because Logsdon has not alleged that Rutherford performed any of the actions forming the basis for this portion of Logsdon's claim, qualified immunity will be granted to Rutherford, and summary judgment granted in his favor as to this portion of the claim. *See West v. City of Paris*, No. 13-cv-193-JMH, 2015 WL 278142, at *5 (E.D. Ky. Jan. 22, 2015) ("However, there is no evidence from West or any other witness which attributes such conduct to either Dempsey or Toadvine, both of whom deny engaging in such actions. Under these circumstances, no reasonable finder of fact could conclude that Dempsey or Toadvine engaged in actions which could have violated West's constitutional right to be free from the use of excessive force.").

### 3. *Assault*

The second major point of contention between the parties is whether White punched Logsdon once in the head or administered a beating to his face and head. There is no dispute that White punched Logsdon after tasing Logsdon three times and handcuffing him. (Defs.' Mot. for Summ. J. 3-4; Compl. 3). Defendants maintain, however, that the injuries to Logsdon's face were caused by his face-first fall into gravel following the first taser strike. (Defs.' Mot. for Summ. J. 3).

Each party has submitted pictures of Logsdon showing what appears to be a bloodied nose, abrasions to his lips, a blackened left eye, and a cut to his left temple. (Defs.' Mot. for Summ. J. Ex. 6, DN 50-6; Pl.'s Resp. to Mot. for Summ. J. Ex. 9-9a, DN 51-10 to 51-11). Further evidence in the form of Paul Logsdon's affidavit indicates that White severely beat

9

Logsdon in the face (P. Logsdon Aff. 2, DN 51-5), and Sandra Logsdon's affidavit stating that she heard someone say "stop hitting him, you have him on the ground." (S. Logsdon Aff. 2, DN 51-7).[4]

Defendants submitted Logsdon's medical records from Caverna Memorial Hospital ("CMH") which show that, on the day following Logsdon's arrest, he returned to CMH. (Pl.'s Medical R. 13-20). Notes from that visit reflect that Logsdon had, *inter alia*, dried blood on his face, a black eye, and lower lip abrasions. (Pl.'s Medical R. 15). Logsdon reported that he was "struck in the face multiple times." (Pl.'s Medical R. 15). A CT of Logsdon's facial bones revealed no acute facial fracture. (Pl.'s Medical R. 17).

There is a genuine issue of material fact regarding whether White beat Logsdon or whether Logsdon suffered his injuries from falling face-first into gravel after initially being tased. If the Court assumes *arguendo* that White beat Logsdon about the face and head, causing Logsdon's facial injuries, the question again is one of reasonableness. The Sixth Circuit has held that "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable." *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002)). The further question then is whether or not Logsdon was neutralized when White beat him.

A sister court recently addressed a situation in which police officers stunned, beat, placed in handcuffs and then again struck an arrestee in the face. *West*, No. 13-cv-193-JMH, 2015 WL 278142, at *5. After the arrestee alleged excessive force, that court concluded that initially tasing the plaintiff after he had wrestled with one officer on the ground and rose to his feet thereafter

---

[4] In his response to the present motion, Logsdon includes an account by Donnie Logsdon, Logsdon's father. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 3-5). Logsdon did not provide Donnie Logsdon's statement in the form of a sworn statement; consequently, the Court does not consider this statement in its analysis.

was objectively reasonable. *Id.* After the arrestee was incapacitated from the stun and placed in handcuffs, there was a genuine issue of material fact as to whether the plaintiff was subjected to excessive force. *Id.*

The Court finds that *West* is similar enough to this case to apply it as persuasive authority. Logsdon has not presented evidence of whether he was neutralized at the time that White struck him repeatedly about the face and neck. It is for the jury to decide what events occurred while Logsdon was handcuffed, *i.e.*, whether White punched Logsdon once or assaulted him, and whether those events constituted excessive force.

Defendants' arguments that Logsdon's excessive force claim is barred by collateral estoppel or the *Heck* doctrine lack merit. *See Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005) (noting that "*Heck* bars § 1983 plaintiffs from advancing claims that, if successful, "would necessarily imply the invalidity" of a prior conviction or sentence." (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). The final judgment in Logsdon's criminal case does not contain any finding of fact that would preclude Logsdon's claim, *e.g.*, a finding that Logsdon resisted arrest until placed in White's cruiser, or a finding that he resisted arrest by struggling to rise after first being tased. (J., DN 50-1). While Logsdon pleaded guilty to resisting arrest, he did not plead guilty to resisting arrest specifically during the timeframe in which he was handcuffed and allegedly beaten.

As for the *Heck* doctrine applied to the ramming of the horse and the beating specifically, Logsdon is not challenging his criminal conviction in his § 1983 claim. Even if a jury were to find that excessive force was used, that would not negate any of Logsdon's convictions in state court.

11

Accordingly, the Court will deny Defendants' motion for summary judgment on the excessive force claim against White, because there is a genuine issue of material fact regarding what White's actions were and whether those actions were objectively reasonable. The Court will grant summary judgment for Rutherford based upon qualified immunity, because he is not alleged to have struck Logsdon at any point.

### B.      Inflicting Cruel and Unusual Punishment

Logsdon alleges "[t]hat Defendants' [sic] had a culpable state of mind in delaying medical care in that they failed to take any action, despite knowledge of a substantial risk of serious harm to Plaintiff." (Compl. 12). The sequence of events as explained by Logsdon is that following his arrest, he was driven to the Hart County Jail, where he was refused pending medical clearance. (Compl. 3). Defendants then took him to receive medical care, which Logsdon refused. (Compl. 3). Defendants then returned him to the Hart County Jail, and, presumably, he was accepted by the jailer. (Compl. 3).

Logsdon does not allege that he had a previous medical condition that required prompt treatment following his arrest. The Court must infer, therefore, that Logsdon is referring to the injuries he sustained as the result of the actions culminating in his arrest. Logsdon alleges in his complaint that he suffered injuries "to his head, face, teeth, lips, and a broken leg." (Compl. 3). Logsdon's medical records from CMH show that, Logsdon's assertion notwithstanding, an x-ray of his ankle reflected no fracture or dislocation, and his diagnosis upon departure was an ankle sprain, not fracture. (Defs.' Mot. for Summ J. Ex. 8, at 16, 18). Similarly, the medical records reflect that Logsdon reported no loose teeth or dental pain during his visit to CMH. (Defs.' Mot. for Summ J. Ex. 8 at 15). Even viewed in the light most favorable to Logsdon, his uncontroverted medical records reveal that he did not suffer a broken leg or injuries to his teeth.

Consequently, in evaluating Logsdon's injuries and treatment in light of Logsdon's right to be free from cruel and unusual punishment, the Court will consider only the injuries reflected in the record, *i.e.*, the injuries to Logsdon's head, face, and lips.

"Though the Eighth Amendment's prohibition of cruel and unusual punishment does not apply to pretrial detainees, the Fourteenth Amendment's Due Process Clause affords pretrial detainees a right to adequate medical treatment that is analogous to the Eighth Amendment right of prisoners." *Estate of Harbin v. City of Detroit*, 147 F. App'x 566, 569 (6th Cir. 2005) (citing *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2005)). In order to prevail under Section 1983 for failure to provide medical treatment, a plaintiff must demonstrate that the defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted). Such claims have an objective component and a subjective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The objective component requires that the plaintiff allege that his or her medical need is "sufficiently serious." *Id.* at 702-03 (internal quotation marks omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 703 (citing *Farmer*, 511 U.S. at 837). In short, the injury must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," and the need for treatment must not have been "addressed within a reasonable time frame." *Scozzari v. Miedzianowski*, 454 F. App'x 455, 464 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899-900 (6th Cir. 2004)).

As discussed above, while Logsdon alleges more serious injuries, his medical records refute that his injuries were anything more serious than abrasions to his lips, a blackened eye, and a sprained ankle. Therefore, Logsdon's deliberate indifference claim does not satisfy the necessary objective component. *See Cain v. Irvin*, 286 F. App'x 920, 927 (6th Cir. 2008) (holding that a black eye did not meet the objective component of a deliberate indifference claim, and noting that "[i]f that were the case [that the obviousness test addressed whether the injury is merely observable to bystanders], even untreated bloody noses or visible scrapes would satisfy the objective prong . . ."). Because Logsdon has not shown a sufficiently serious medical condition, he cannot prevail on a claim of deliberate indifference constituting cruel and unusual punishment in delaying treatment of his serious medical needs. The Court therefore grants Defendants' motion for summary judgment as to this claim.

### C. Refusing or Neglecting to Prevent Harm

In his complaint, Logsdon asserts two claims of refusing or neglecting to prevent harm. The first alleges that White refused or neglected to prevent harm by failing to insure "prompt and adequate medical care." (Compl. 13). The second alleges that Rutherford failed to prevent White's excessive use of force and had the power to do so. (Compl. 13-14).

#### 1. *Failing to Insure Prompt and Adequate Medical Care*

In his response, Logsdon abandons his claim of failing to insure prompt and adequate medical care. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 16) ("This is not a case about White seeking medical care after the damage was done or medical care after the beating."). Accordingly, the Court will grant summary judgment in favor of Defendants as to this claim.

14

### 2. *Failure to Prevent Use of Excessive Force*

Without a showing of direct responsibility, presence alone during an instance of excessive force cannot provide a basis for liability. *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). Absent participation in the events forming the basis of Logsdon's excessive force claims, in order to prevail on his failure to prevent use of excessive force claim, Logsdon must show that Rutherford "observed or had reason to know that excessive force would be or was being used *and* had both the opportunity and means to prevent the harm from occurring." *Id.* (emphasis in original) (internal quotation marks omitted) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

The record does not indicate that Rutherford observed or had reason to know that excessive force was being used, or, if he did, at what point such observation or inference occurred. According to Defendants' motion, Rutherford approached White after the use of the second taser cycle on Logsdon. (Defs.' Mot. for Summ. J. 4). Rutherford then arrested Logsdon Jr. and placed him in Rutherford's cruiser. (Defs.' Mot. for Summ. J. 4). Rutherford then returned in order to help White get Logsdon to his feet and to the cruiser. (Defs.' Mot. for Summ. J. 4). White has testified that Rutherford did not "get back up to [the] location" until after the third taser cycle, and was in the process of arresting Logsdon Jr. shortly thereafter. (White Dep. 20:23-21:9). For his part, Rutherford stated in his deposition that he did not recall White engaging a taser (Rutherford Dep. 30:17-19, Jan. 13, 2015, DN 50-4); he did recall seeing White strike Logsdon once, but did not remember whether Logsdon was handcuffed at that time or not (Rutherford Dep. 36:12-37:2).

Logsdon alleges in his response that Rutherford stood by and did nothing while White repeatedly punched Logsdon. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 16). He did not lay out the

15

sequence of events in his deposition, nor did the affidavits of the witnesses. Given the disputed evidence as to this claim, a genuine issue of material fact remains regarding Rutherford's observation or inference of excessive force exercised by White. The Court will therefore deny summary judgment.

### D. State Law Claims

Defendants also seek summary judgment on Logsdon's state-law claims of assault and battery, intentional infliction of emotional distress ("IIED"), negligence, and gross negligence.

#### 1. *Assault and Battery*

This Court has previously explained:

> Under Kentucky law, "[a]ssault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." . . . Police officers are privileged to use "reasonably necessary force to preserve order," but not excessive force. An "officer making an arrest may use such force as may be necessary to make the arrest but no more."

*Walker v. City of Lebanon*, No. 3:12-CV-855-H, 2013 WL 6185402, at *7 (W. D. Ky. Nov. 25, 2013) (citations omitted).

Because the Court has concluded that whether White used excessive force is a matter for a jury, the Court must conclude that Logsdon's claims for assault and battery against White must also be left for a jury. *See id.* Consistent with the previous discussion involving Logsdon's excessive force claims, summary judgment will be granted to Rutherford as he is not alleged to have struck or threatened to strike Logsdon at any point.

#### 2. *Intentional Infliction of Emotional Distress*

In his response, Logsdon abandons his claim of intentional infliction of emotional distress, because he has separately pleaded assault and battery. (Pl.'s Resp. to Defs.' Mot. for

16

Summ. J. 17). Accordingly, the Court will grant summary judgment in favor of Defendants as to this claim.

### 3. *Negligence and Gross Negligence*

Logsdon alleges in his complaint that Defendants owed him a duty of care "to follow the proper police policies, procedures, and techniques and to act as a reasonable police officer under the same circumstances to ensure [his] safety," and that they breached this duty. (Compl. 19-20). Logsdon also alleges that Defendants owed him an unspecified duty of care and that they breached the duty by "failing to exercise even slight care, and acted in a manner consistent with wanton or reckless disregard for the life and safety of Mr. Logsdon," and that Defendants' "breach of duty was so egregious that it rises to the level of gross negligence and supports an award of punitive damages." (Compl. 21-22).

In his response to Defendants' motion, Logsdon cites *City of Lexington v. Gray*, 499 S.W.2d 72 (Ky. App. 1998) and *Lexington-Fayette Urban Cnty. Gov't v. Middleton*, 555 S.W.2d 613 (Ky. App. 1977), for the proposition that a negligence claim lies "for an otherwise lawful arrest if more force than necessary was used." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 19). Problematically for Logsdon, neither *Gray* nor *Middleton* contains the word "negligence."

Logsdon also relies on *Pile v. City of Brandenburg*, 215 S.W.3d 36 (Ky. 2006), seemingly for the position that controlling a police cruiser is a ministerial function, and thus that a negligence claim will lie when an officer neglects to safely control his or her police cruiser. (Pl.'s Resp. to Defs.' Mot. for Summ. J. 19). The Kentucky Supreme Court noted in *Pile* that "[t]he negligent operation of an emergency vehicle by a police officer which violates existing police procedures or regulations or statutory traffic regulations is certainly actionable . . . ." *Pile*, 215 S.W.3d at 41. That court also relied on a specific statute to establish that the officer may

17

have violated a statutory traffic regulation, and that statute is not applicable in this case. *See id.* (relying on KRS 189.430(3)). Logsdon, on the other hand, has not identified any specific police procedures, police regulations, or statutory traffic regulations that White purportedly violated.

Additionally, while dicta, Defendants highlight this Court's previous statements questioning whether a police officer owes a duty of care to a fleeing suspect. (Defs.' Mot. for Summ. J. 21). The Court noted in *Walker v. Davis* that:

> [T]he Court questions whether a pursuing police officer owes a duty of care to fleeing suspects. To be sure, under the Court's analysis of official immunity, a pursuing police officer would owe a duty of care to *innocent* third parties on the roadway. A pursuing officer would not be entitled to official immunity for his negligent driving under those circumstances. However, courts from other jurisdictions that have addressed the question, have found that police officers do not owe such a duty to fleeing suspects. *See, e.g.*, *Lindstrom v. City of Corry*, 563 Pa. 579, 763 A.2d 394 (2000) (no duty of care to fleeing driver); *Jackson v. Oliver*, 204 Mich. App. 122, 514 N.W.2d 195 (1994) (same); *Bryant v. Beary*, 766 So.2d 1157 (Fla. Dist. Ct. App. 2000) (same); 60A C.J.S. *Motor Vehicles* § 763 ("A police officer owes no common law duty of care to a fleeing driver.") (citations omitted).

*Walker*, 643 F. Supp. 2d at 933 n.10 (emphasis in original). Because Logsdon has not identified a duty breached by either Defendant pursuant to *Pile* and the reasoning in *Walker* remains sound, the Court will grant summary judgment to both Defendants as to Logsdon's claims of negligence and gross negligence.

## V. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion for Summary Judgment (DN 40) is **DENIED IN PART** as to the state law battery and assault claims asserted against Trooper Daniel White and the claim of failure to prevent excessive force asserted against Trooper Graham Rutherford;

2. Defendants' Motion for Summary Judgment (DN 40) is **GRANTED IN PART** as to the claims of excessive force, cruel and unusual punishment, refusing or neglecting to prevent

harm regarding Plaintiff's injuries, and negligence and gross negligence asserted against both Defendants;

   3. Defendants' Motion for Summary Judgment (DN 40) is **GRANTED IN PART** as to the assault and battery claims asserted against Trooper Graham Rutherford; and

   4. Defendants' Motion for Summary Judgment (DN 40) is **GRANTED IN PART** on all remaining claims that have been explicitly abandoned.

                  **Greg N. Stivers, Judge**
                  **United States District Court**
                     June 19, 2015

cc: counsel of record